## IN THE UNITED DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRAVIS A. JONES, Individually and On Behalf Of All Others Similarly Situated, | ) ) ) | **Civil Action No. _____** |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| VERTRUE INCORPORATED and ADAPTIVE MARKETING, LLC, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | July 1, 2010 |

Plaintiff, Travis A. Jones ("Plaintiff"), individually and on behalf of all others similarly situated, alleges, based upon personal knowledge, information and belief, and the investigation of his counsel, the following:

### NATURE OF THE ACTION

1.     This action is brought against Defendant, Vertrue Incorporated ("Vertrue"), and its subsidiary, Defendant, Adaptive Marketing, LLC ("Adaptive Marketing") (collectively "Defendants"), which, in conjunction with various e-commerce merchants,[1] have created, maintained, and carried out an unlawful, unfair, and deceptive scheme in which Defendants charge consumers a significant recurring fee for enrollment into Defendants' "membership"

---

[1]These e-commerce merchants include, *inter alia*, Intelius.com, Classmates.com, 1-800-Flowers.com, AirTran Airways, Priceline.com, Avon, and Hotwire.com. "Aggressive Sales Tactics on the Internet and Their Impact on American Consumers" (Nov. 16, 2009), United States Senate Committee on Commerce, Science, and Transportation (the "Senate Committee"), Office of Oversight and Investigations, Government Reform, Majority Staff Report for Chairman Rockefeller, pgs. 13-14, 20, 25, 28 ("November 16, 2009 Staff Report"). The Senate Committee found that Defendants and two other companies that were the subject of the November 16, 2009 Staff Report, Affinion and Webloyalty, had entered into "partnership" agreements with more than 450 e-commerce companies and e-retailers during the preceding ten years.

programs without first obtaining a valid authorization for said transfers, in violation of, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1691-1968, the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq*., and common law.

2.     The central feature of Defendants' unlawful, unfair, and deceptive practices is a common predatory scheme through which Defendants, in association with e-commerce merchants from whom consumers have purchased a product or service, place consumers into one (or more) of Defendants' "membership" programs, and then charge consumers' credit card, debit card, or other accounts with unauthorized "membership fees." Defendants' unauthorized charges result from their unauthorized access to these consumers' private financial and billing information, and come at an individual, ongoing cost to hundreds of thousands or millions of consumers in the amount of $14.95 to $20.95 per month or more – exclusive of fees charged by financial institutions when Defendants' activities result in the consumer's account to be overdrawn or to exceed maximum available credit limits. As a result of this unauthorized enrollment scheme, Plaintiff and members of the putative class are billed for services which they do not want and do not understand they have purchased.

3.     The pattern of fraudulent, misleading, deceptive, and unlawful conduct at issue here is the subject of an investigation by the Senate Committee,[2] in which Vertrue was one of three direct marketing companies investigated for its use of aggressive sales tactics on the Internet, including the sales tactic known as "post transaction marketing" and "data pass."[3] The Senate Committee explained that Defendants, and other companies, engaged in "aggressive third

---

[2]November 16, 2009 Staff Report.

[3]*Id.* at 1-5.

party post-transaction marketing" of products or services such as Defendants' "membership"

programs, confuse consumers by using, *inter alia*, (1) "interstitial sales" offer pages, which

appear between the checkout page and the confirmation page of the e-retailer from whom the

consumer intends to make a purchase; (2) "pop up" windows, which appear on top of the

confirmation page; and (3) hyperlinks or "banners" that are included directly on the confirmation

page itself.[4]

     4.     The Senate Committee explained that "data pass" occurs when the consumer is

"signed up for a third party membership program without entering his or her credit card

information."[5]  Specifically, "[i]nstead of requiring the consumer to enter [his/her] billing

information a second time to confirm acceptance of the new offer, the retailer will pass the

consumer's credit card and billing information to the third party once the consumer has provided

information that the third party regards as 'proof of enrollment,' such as an e-mail address."[6]

     5.     The Senate Committee concluded that each company, including Vertrue, "use[s]

aggressive sales tactics intentionally designed to mislead online shoppers," and that use of these

tactics "exploits shoppers' expectations about the online purchasing process to charge millions of

consumers each year for services the consumers do not want and do not understand they have

purchased."[7]  The investigation further concluded that ***"[h]undreds of e-commerce merchants -***

***including many of the best-known, respected websites and retailers on the Internet - allow***

---

[4]*Id.* at 2-3.

[5]*Id.* at 3.

[6]*Id.*

[7]*Id.*

*these ... companies to use aggressive sales tactics against their customers, and share in the revenues generated by these misleading tactics*."[8]  (Emphasis added).

6.     As part of their pattern of wrongful conduct during the Class Period, Defendants have, in association with e-commerce merchants, utilized (and continue to utilize) interstate wire facilities, namely, the Internet, to fraudulently and deceptively market Defendants' "membership" programs to consumers, and, in doing so, Defendants' business activities have affected interstate commerce.

7.     Defendants do not alert consumers of their enrollment in Defendants' "membership" programs.  Instead, consumers are unsuspectingly billed for these programs on the same credit, debit, or charge card used by the consumers for their initial purchase of products or services from third-party e-commerce merchants.

8.     Defendants are aware of complaints regarding their fraudulent, misleading, deceptive, and unlawful business practices by virtue of several consumer watchdog authorities, consumers themselves, and now through the investigation of the Senate Committee, which requested and obtained documents from Defendants related to their online business practices and has requested documents from other companies which have apparently engaged in the same online sales practices.[9]

9.     Commenting on the work of the Senate Committee, the Attorney General of the State of Connecticut (where Defendants have their principal places of business) also issued a press release on November 17, 2009, which stated:

_____

[8] *Id.*

[9] *Id.* at 13.

-4-

> I am pleased that Sen. Jay Rockefeller and his committee have joined the fight against bogus membership clubs that trick consumers into enrolling and fail to produce promised discounts and deals.  I welcome Sen. Rockefeller as an ally in my longstanding fight against membership club abuses.
>
> I successfully sued Affinion, formally known as Trilegiant, in 2006 for deceiving consumers, winning $14.5 million in restitution and penalties. My office is investigating Vertrue and Webloyalty for similar abuses, as well as whether Affinion is complying with its settlement with my office.  I will take legal action if justified by the results of our investigations.
>
> I urge consumers solicited online or by mail to shun these membership clubs. They use trickery to enroll consumers and then fail to deliver promised benefits.
>
> I will continue to vigorously and aggressively fight membership club scams, suing for restitution and penalties when appropriate.

10.    Accordingly, Plaintiff, on behalf of himself and all others similarly situated whose credit, debit or other accounts have been assessed "membership fee" charges as a result of Defendants' unlawful, unfair and deceptive scheme, brings these claims against Defendants for violations of (a) RICO, 18 U.S.C. §§ 1961-1968; (b) ECPA, 18 U.S.C. § 2510, *et seq.*; and (c) unjust enrichment.  Plaintiff seeks, *inter alia*: an order certifying the proposed Plaintiff Class under Rule 23 of the Federal Rules of Civil Procedure; an order appointing Plaintiff and his counsel of record to represent the Class; restitution, statutory damages, and injunctive and declaratory relief on behalf of Plaintiff and the Class; and any such further relief as the Court may deem proper under the circumstances.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, specifically 18 U.S.C. §§ 1961-1968

and 18 U.S.C. § 2510, *et seq.*  This Court also has jurisdiction over this class action pursuant to 28 U.S.C. § 1332 because, in the aggregate, the claims of Plaintiff and the members of the Class exceed the jurisdictional minimum amount in controversy of $5,000,000, exclusive of costs and interests.  28 U.S.C. § 1332(d)(2)(A) and § 1332(6).  Additionally, members of the putative class are citizens of a State different from the Defendants.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, Defendants are domiciled in this District, and/or because Defendants have sufficient contacts with this District.

## PARTIES

13.     Plaintiff is, and at all relevant times was, a resident of Lexington, North Carolina. In or about October 2007, Plaintiff accessed the Intelius.com website in order to conduct a background search.  Plaintiff incurred a one-time charge of $14.95 for this Intelius service, which he paid for by using his Chase-issued credit card and providing confidential account and billing information to the Intelius.com website.  Subsequently, Defendants, who were not parties to Plaintiff's transaction with Intelius.com, obtained Plaintiff's personal, private, and confidential credit card information, enrolled him in Defendants' "membership" program called "Privacy Matters Identity," and then charged his credit card recurring "membership fees" for this program. Plaintiff was charged for Defendants' "Privacy Matters Identity" program from on or about October 27, 2007 through March 17, 2010, in amounts which began at $14.95 per month, increased to $17.95 per month, and again increased to $20.95 per month.  At no time did Plaintiff provide his consent for his credit card to be used for enrollment in any of Defendants' "membership" programs.

-6-

14.     Vertrue is a corporation established under the laws of the State of Delaware, with its principal place of business located at 20 Glover Avenue in Norwalk, Connecticut.  Vertrue markets club memberships under the auspices of its subsidiary, Adaptive Marketing.

15.     Adaptive Marketing is a limited liability company established under the laws of the State of Delaware, with its principal place of business located at 20 Glover Avenue in Norwalk, Connecticut.  Adaptive Marketing is a subsidiary of Vertrue.

## ALTER EGO/AGENCY/CONSPIRACY/AIDING AND ABETTING

16.     Vertrue is an Internet marketing services company that sells consumer-based membership and loyalty programs offered by its wholly-owned subsidiaries, including Adaptive Marketing.  Adaptive Marketing, like its parent company, Vertrue, sells "membership programs" that purport to provide consumers with identity and financial protection, as well as access to discounts on various consumer goods and services, among other things.  Adaptive Marketing is located in the same building as Vertrue, shares personnel with Vertrue, and markets the identical "membership programs" as Vertrue.  There is a unity of interest and ownership between Vertrue and Adaptive Marketing.  Further, Adaptive Marketing is controlled, managed, and operated by Vertrue.

17.     At all relevant times, each of the Defendants was a principal, agent, alter ego, joint venturer, partner, and/or affiliate of the other Defendant, and in doing the acts alleged herein, each was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, and/or affiliate relationship.  Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant, and ratified, approved, joined in, acquiesced, and/or authorized the wrongful acts of each co-Defendant and/or retained the benefits of said

wrongful acts.

18.    Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendant, and others, in perpetrating their unlawful, unfair, and deceptive scheme on Plaintiff and the proposed Class, as alleged herein.  In taking action, as particularized herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other wrongdoings complained of, each Defendant acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

19.    Defendants, and each of them, conspired with each other and with others, to perpetrate the unlawful, unfair, and deceptive scheme on Plaintiff and the proposed Class, as alleged herein.  In doing so, each Defendant has performed acts and/or made statements in furtherance of the said conspiracy, common enterprise, and/or common course of conduct. Defendants were direct, necessary, and substantial participants in the conspiracy, common enterprise, and/or common course of conduct complained of, and each Defendant was aware of its overall contribution to and furtherance of the said conspiracy, common enterprise, and/or common course of conduct.

## STATEMENT OF FACTS

**A.    Defendants' "Membership" Programs**

20.    Online shopping has exploded within the last 15 years.  Shopping on the Internet has become fairly commonplace for goods, services, and information.

21.    With the growth of the use of the Internet to make online purchases, consumers have been subjected to Internet scams such as "cramming" and "data passing."  The term

"cramming" refers to the practice of imposing unauthorized charges on customer billing statements. The term "data passing" refers to the practice of automatically and unilaterally transferring the credit or debit card information of consumers from an online merchant to an unfamiliar third party for the purpose of enrolling and charging consumers "membership fees" for membership into a club or program belonging to the third party.

22.     Adaptive Marketing, as a subsidiary, division, operational department, and/or agent of Vertrue, is in the business of marketing and selling membership programs for goods and services ("Membership Programs"). These Membership Programs allegedly provide consumers the opportunity to obtain information and/or discounts on various goods and services for a periodic "membership fee," ranging from $14.95 to $20.95 per month or more. Defendants assess this "membership fee" against consumers' credit, debit, or other accounts on a monthly, bi-monthly, semi-annual, and/or annual basis. The Membership Programs marketed and sold by Defendants include, *inter alia*:

- **Privacy Matters Identity**:     A purported identity protection program membership.

- **Privacy Matters 1-2-3**:     A personal finance management and credit protection membership.

- **24 Protect Plus**:     A purported comprehensive membership program offering such items as roadside assistance, gift card and store discounts, and financial tools and planning advice.

- **At Home Rewards Plus**:     A home improvement and decoration membership.

- **Passport to Fun Plus**:     A family activities discount membership.

- **Business Max**:     A business discount membership.

| | | |
|---|---|---|
| • | **SavingsSmart**: | A consumer discount membership. |
| • | **Shopping Essentials Plus**: | A discount membership for everyday purchases and services. |
| • | **Simply You**: | A discount membership for personal, family, and home needs. |
| • | **Today's Escapes Plus**: | A travel and entertainment discount membership. |
| • | **ValueMax**: | A discount shopping program membership. |

23.    Defendants market and sell these Membership Programs to consumers in this

judicial district and throughout the United States.

**B.    Defendants' Practice of Unlawfully, Unfairly, And Deceptively Enrolling Consumers In Their Membership Programs**

24.    In connection with Defendants' Membership Programs and to further the

marketing and sales efforts related thereto, Defendants enter into agreements with information

retrieval and social network providers, financial institutions, retailers, telephone service

providers, car rental companies, mortgage lenders, hotels, cable companies, and Internet service

providers – many of whom are Fortune 500 companies – including, *inter alia*, Intelius.com,

Classmates.com, 1-800-Flowers.com, AirTran Airways, Priceline.com, Avon, and Hotwire.com.

A significant part of these partner companies' business is devoted to e-commerce.

25.    Pursuant to the marketing and sales agreements entered into between Defendants

and e-commerce merchants, in exchange for valuable compensation, Defendants obtain personal

identifying, financial, and billing information about the e-commerce merchants' customers.

Defendants then use this private consumer information to market, sell, and charge unwitting

consumers for Defendants' Membership Programs.  Routinely, Defendants add the partner

merchant's name to Defendants' marketing materials, solicitations, and charges, giving the false,

deceptive, and/or misleading appearance that the Membership Program is sponsored, marketed,

sold, or charged by the partner, when in fact it is not.

26.     To facilitate their deception, Defendants also routinely hide and obscure the true

nature, name, and cost of the Membership Program charged for and their responsibility for it.

Defendants will typically charge for a program described as "ValueMax" in one month's billing

statement, but then describe the same program as "VALMAX" in a subsequent billing statement.

In Plaintiff's case, the billing descriptions for Defendants' "Privacy Matters Identity" program

changed three times:  from "AP9*PMIDENTITY.COM-V" in some statements, to

"MVQ*PRIVACYMID" on other statements, and also to "AP9*PMIDENTITY.COM."

Likewise, the charges for this "Privacy Matters Identity" program changed from $14.95 to $17.95

to $20.95.  Neither Defendants, nor the e-commerce merchants with whom the consumers made

their original transactions, are referenced in the billing descriptions.

27.     Defendants market their Memberships Program through, *inter alia*, Internet

advertisements which fail to disclose to or otherwise alert consumers that they have been placed

in one (or more) of Defendants' Membership Programs, or that Defendants have charged a

"membership fee" against the consumer's credit, debit, or other accounts without the consumer's

valid authorization or consent.  Using Internet advertising, Defendants urge consumers to, *inter*

*alia*,  accept Defendants' offers for "free" trial memberships, but they do not disclose that at the

expiration of the "free" trial period, the consumer's credit, debit or other account will be charged

automatically for a one-year membership without the consumer's authorization.  Defendants also

fail to disclose that they automatically renew the membership(s), and automatically charge the

consumer's credit, debit, or other accounts for successive membership periods in perpetuity,

unless the consumer takes affirmative steps to successfully cancel the membership(s). As a result

of these unlawful, unfair, and misleading practices, consumers are wrongfully and deceptively

charged for Defendants' Membership Programs, even though the consumers do not knowingly

consent to purchasing or being billed for such Programs, and do not provide Defendants with

valid authorization, in writing or otherwise, to withdraw funds from or assess charges against the

consumer's credit, debit, or other accounts.

        28.     Despite being placed in Defendants' Membership Programs, consumers never

receive a membership card, confirmation e-mail, or any other form of acknowledgment for their

purported membership.

        29.     A March, 2009 *Seattle Weekly* article described Defendants' practice of

deliberately deceiving consumers into signing up for their Membership Programs:

> [M]any users apparently failed to realize they are giving such
> consent, and it's easy to see why. Say you do a "people search"
> through Intelius, a service that costs $1.95 and provides an
> individual's phone numbers, addresses, birthday, relatives, and
> other information. After you enter your credit-card number, a page
> comes up thanking you for your order in big, bold type. In
> somewhat smaller and less-bold type, it also says you can get $10
> back as a member of ValueMax (an Adaptive program offering
> discounts at stores like Kmart and Bed Bath & Beyond). In really
> small, regular type, it tells you that membership will entail your
> credit card being charged $19.95 a month after a "7-day FREE trial
> period."
>
> Remember, you still haven't gotten access to the information you
> paid for. To get it, you have two choices: Click on the big orange
> rectangle, off to the side of all these instructions that say "YES,
> and show my report," or click on the small black one-line link that
> says "No, show my report." The YES button is what gets you
> monthly ValueMax fees.

30.   A May, 2008 *TechCrunch* article describes an equally deceptive manner by which

Defendants cause consumers to unknowingly "order" their Membership Programs:

> Every time a customer buys a product at Intelius, they are shown a
> page telling them "Take our 2008 consumer Credit Survey and
> claim $10.00 CASH BACK with Privacy Matters Identity." The
> user is then shown two survey questions and asked to enter their
> email and click a large orange button. They can choose to skip the
> survey by clicking on a small link at the bottom of the page.
>
> Undoubtedly a lot of consumers do the survey and move forward to
> the next page – it only takes a second. But what most people don't
> do is read the fine print, which gives no real details on the $10 cash
> back (in fact, it is never mentioned again, anywhere). Instead, in a
> light gray small text, users are told that by taking the survey they
> are really signing up to a $20/month subscription. Intelius
> forwards your personal information, including your credit card
> number, to Adaptive Marketing. The next day a $20 charge
> appears on your credit card, and each month afterwards.
>
> * * *
>
> Of course you never hear from Adaptive Marketing again (why
> take a chance that you'll wonder who they are). Instead, the credit
> card charges keep coming, and the company obviously hopes you
> never notice.
>
> This survey is quite literally a complete and total scam. And since
> users continue to pay forever (or until they try to stop it), the
> contribution to Intelius' revenue grows significantly over time.

31.   When consumers are enrolled into one or more of Defendants' Membership

Programs, Defendants fail to disclose the following material information:  (a) the fact of

enrollment of consumers in their Membership Programs; (b) the fact of, or amount of, the

recurring charges by Defendants to unsuspecting consumers for enrollment in the Membership

Programs; (c) the terms and conditions involved in the Membership Programs; (d) the benefits (if

any), features, components or elements of the Membership Programs; (e) the manner of accessing

-13-

and/or using the Membership Programs; (f) that Plaintiff and Class members' credit, debit or charge card and other personal, private and confidential information is transferred to Defendants for the purpose of systematically charging Plaintiff and Class members for their enrollment in the Membership Programs; (g) that Defendants create, operate, and service the Membership Programs; and/or (h) the manner or ability for consumers to communicate with Defendants or to otherwise initiate the cancellation of their Membership Programs.  By intentionally omitting this material information, and doing so under fraudulent pretenses, consumers are deceived and are likely to continue to be misled or deceived by Defendants' marketing and sale of their Membership Programs, resulting in significant recurring charges to consumers that they would not otherwise have incurred had Defendants disclosed the information.

C.    **Government Investigation Of Defendants' Marketing Practices**

32.    The aggressive sales tactics practiced by Defendants, and others, became the subject of an investigation by the Senate Committee, launched in May, 2009.  As part of that investigation, the Senate Committee collected and reviewed thousands of pages of documents produced by three online internet marketers, including approximately 128,000 pages of documents from Defendants.  In addition, requests for information were sent on November 6, 2009, to 16 companies who partnered with the online Internet marketers, including Defendants.

33.    Financial information provided to the Senate Committee by the three online marketers showed that the three companies together generated over $1.4 billion in revenue from Internet customers who were charged for membership programs.

34.    The key preliminary findings of the Senate Committee's investigation are:

•    Using aggressive sales tactics to enroll consumers in unwanted membership clubs

-14-

is a billion-dollar business.

• Hundreds of well-known websites and online retailers have earned hundreds of millions of dollars employing aggressive online sales tactics.

• Defendants (along with the other two online marketers) have knowingly charged millions of consumers for services that consumers do not use and are not aware they have purchased.

• Defendants' (along with the other two online marketers) customer service centers are almost entirely dedicated to handling the large volume of calls from angry and confused consumers requesting cancellations.

• E-commerce companies know that their customers are being harmed by the aggressive sales tactics of Defendants (and the other two online marketers).

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on behalf of himself and all other similarly situated members of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This class action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23 and the provisions therein.

36.     The proposed Class is as follows:

> All persons and entities, within the United States, who, from January 1, 2007 through the present, were charged for one or more of Defendants' Membership Programs (the "Class").

37.     Excluded from the Class are (a) Defendants, any entity or division in which any of the Defendants has a controlling interest, and its/their legal representatives, officers, directors, assigns and successors; and (b) this Court and any member of Your Honor's immediate family and courthouse staff.

38.     The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time,

Plaintiff believes that there are at least thousands of members in the proposed Class.  Members of the Class can be identified from records maintained by Defendants.

39.     Plaintiff's claims are typical of the claims of the other members of the Class.  All members of the Class have been and/or continue to be similarly affected by Defendants' wrongful conduct as complained of herein.  Plaintiff has no interests adverse to those of the Class.

40.     Plaintiff will fairly and adequately protect the Class members' interests and has retained counsel competent and experienced in consumer class action lawsuits and complex litigation.

41.     Common questions of law and fact exist as to all Class members and predominate over any questions wholly affecting individual Class members.  Among the questions of law and fact common to the Class are:

      (a)     Whether Defendants omitted, concealed, or misrepresented facts concerning the enrollment of consumers in their Membership Programs, and whether such omissions, concealments, or misrepresentations were intended to and did mislead and deceive consumers;

      (b)     Whether Plaintiff and Class members' credit, debit, and/or charge information was wrongfully accessed or caused to be accessed by a party who was not authorized to access Plaintiff and Class members' private credit, debit, or charge card information;

      (c)     Whether the acts and omissions of Defendants violated Sections 1962(c) and (d) of RICO, 18 U.S.C. § 1962(c) and (d);

(d)    Whether Defendants violated Section 2510 of the ECPA, 18 U.S.C. §

2510 *et seq.*, by intentionally accessing, causing to be accessed, and/or

transmitting personal and private information of Plaintiff and Class

members that was electronically communicated over the Internet and/or

contained on their computers, or using a device to do so;

(e)    Whether Defendants violated Section 2510 of the ECPA, 18 U.S.C. §

2510 *et seq.*, by intentionally disclosing, causing to be disclosed, and/or

using Plaintiff's and Class members' electronic communications;

(f)    Whether Defendants committed unfair, fraudulent, and deceptive acts and

practices in surreptitiously charging Plaintiff and Class members for

enrollment in their Membership Programs;

(g)    Whether treble damages should be awarded to Plaintiff and the members

of the Class;

(h)    Whether Plaintiff and the Class have sustained damages and loss as a

result of Defendants' actions, and the nature and extent of damages to

which Plaintiff and the other members of the Class are entitled;

(I)    Whether Defendants have been unjustly enriched at the expense of

Plaintiff and the Class; and

(j)    Whether Plaintiff and the Class are entitled to injunctive and/or

declaratory relief.

42.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it extremely difficult for Class members to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

43.     Plaintiff reserves the right to modify the class definition prior to moving for class certification.

**FIRST CAUSE OF ACTION**
**(For Violations of Section 1962(c) of RICO)**

44.     The preceding paragraphs of this Complaint are realleged and incorporated herein by reference.  This claim, which asserts violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against both Defendants.

**The RICO Enterprise**

45.     At all relevant times, Defendants, and each of them, unlawfully, knowingly and intentionally conducted and participated, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity as set forth below, in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c).

46.     Defendants, together with e-commerce merchants, formed an association-in-fact for the common purpose of unlawfully, fraudulently, and deceptively marketing and selling Defendants' Membership Programs to consumers, including Plaintiff and Class members.  In order to carry out their common purpose, Defendants and their partner merchants established, directed, and/or participated in the operation and management of an ongoing, independent structure and mechanism for extracting from consumers unauthorized "membership fees" related to Defendants' Membership Programs.  Said structure worked, and continues to work, as follows:

In exchange for valuable compensation, Defendants are provided with consumers' personal identifying and financial information by the partner merchants, without consumers' authorization or consent.  Defendants, in turn, use this information to enroll consumers in their Membership Programs, again without consumers' authorization or consent, and then charge them substantial unauthorized "membership fees," ranging from $14.95 to $20.95 per month or more.   At all times, Defendants and their partner merchants knew and intended to defraud consumers of "membership fees" by means of this independent structure, thereby maximizing their respective profits in the process.  This association-in-fact constitutes an "enterprise" within the meaning of Section 1961(4) of RICO, 18 U.S.C. § 1961(4).

47.     At all relevant times, Defendants, and each of them, were "person(s)," as that term is defined in Section 1961(3) of RICO, 18 U.S.C. § 1961(3), and are legally distinct from the enterprise.

48.     At all relevant times, the enterprise as described herein was engaged in, and its activities affected, interstate commerce within the meaning of Section 1962(c) of RICO, 18 U.S.C. § 1962(c).

**Racketeering Activity and Predicate Acts**

49.     Defendants, and each of them, engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in acts that constitute a violation of the following statute: 18 U.S.C. § 1343 (wire fraud).

50.     Defendants, and each of them, together with the e-commerce merchants, did willfully and with the purpose to defraud consumers, including Plaintiff, and to obtain consumers' money or property by means of false pretenses, engage in fraudulent conduct

constituting wire fraud, in violation of 18 U.S.C. § 1343, by engaging in the following acts:

    a.    Forming and maintaining the RICO enterprise;

    b.    Fraudulently concealing from consumers that they have been unilaterally enrolled in Defendants' Membership Programs without their authorization or consent;

    c.    Fraudulently concealing from consumers that they have been, and will continue to be, charged for their membership in Defendants' Membership Programs;

    d.    Fraudulently concealing from consumers the fact of, or amount of, the recurring charges they will incur by virtue of their enrollment in Defendants' Membership Programs;

    e.    Fraudulently concealing from consumers the terms and conditions relating to Defendants' Membership Programs;

    f.    Fraudulently concealing from consumers the benefits (if any), obligations, features, components, or elements of Defendants' Membership Programs;

    g.    Fraudulently concealing from consumers the manner of accessing and/or using Defendants' Membership Programs; and

    h.    Fraudulently concealing from consumers that Plaintiff and Class members' credit, debit, or charge card and other personal, private, and confidential information is transferred by e-commerce merchants to Defendants for the purpose of systematically and unilaterally charging Plaintiff and the Class for enrollment in Defendants' Membership Programs.

51.    By virtue of the foregoing fraudulent activities, Defendants have engaged in a pervasive pattern of unlawful and unfair business practices, causing harm to Plaintiff and the members of the Class.  Defendants' fraudulent conduct, as described above, constitutes a scheme or artifice to defraud Plaintiff and Class members.

52.    In furtherance of and for purposes of executing the foregoing fraudulent and illegal course of conduct and scheme to defraud, Defendants, together with the e-commerce merchants, used and caused to be used interstate wire communications to transmit or disseminate

-20-

false, fraudulent, and misleading communications and information, in violation of the wire fraud

statute, 18 U.S.C. § 1343.  Defendants' use of interstate wire facilities includes text and images

relating to Defendants' Membership Programs which fraudulently and deceptively appear on

their partner merchants' websites, including, *inter alia*, (1) "interstitial sales" offer pages

appearing between the checkout page and the confirmation page of the e-commerce merchant

from whom the consumer intends to make a purchase; (2) "pop up" windows appearing on top of

the confirmation page; and (3) hyperlinks or "banners" that are included directly on the

confirmation page itself.[10]

53.     All of the interstate wire communications were made in furtherance of

Defendants' scheme to defraud Plaintiff and Class members and to obtain their money or

property by means of false pretenses.

54.     Each interstate wire communication that was made in furtherance of Defendants'

scheme to defraud Plaintiff and Class members and to obtain their money or property by means

of false pretenses, constitutes a separate and distinct act of "racketeering activity," as that term is

defined in Section 1961(1) of RICO, 18 U.S.C. § 1961(1).

55.     Defendants, together with the e-commerce merchants, each committed and/or

abetted the commission of significantly more than two of these acts of "racketeering activity."

The predicate acts are common to Defendants' scheme to conduct the affairs of the RICO

enterprise, and the acts are continuing and threatening to continue indefinitely.  These predicate

acts are chargeable and indictable, as required under Section 1961(1) of RICO, 18 U.S.C. §

1961(1).

---

[10]November 16, 2009 Staff Report at 2-3.

56. The racketeering activity was and is related by virtue of common participants, common victims (Plaintiff and Class members), a common structure and method of commission, a common purpose, and a common result of enrolling and charging consumers for unknown and unwanted Membership Programs, thereby defrauding Plaintiff and Class members of significant monies and unjustly enriching Defendants and their collaborators.

57. The racketeering activity is distinct from the RICO enterprise. The enterprise, as an association-in-fact, was formed to facilitate the marketing and sale of Defendants' Membership Programs. The racketeering activity – Defendants and their collaborators' practice of unlawfully, fraudulently, and deceptively collecting unauthorized "membership fees" from consumers through repeated acts of wire fraud – enables Defendants and their collaborators to profitably maintain and conduct the enterprise for the purpose of defrauding consumers.

**Causation**

58. As a direct and proximate result of the racketeering activity, Plaintiff and Class members were enrolled in and charged for Membership Programs, on an ongoing basis, at the cost of $14.95 to $20.95 per month or more, plus any fees charged by financial institutions when Defendants' activities resulted in the consumer's account to be overdrawn or to exceed maximum available credit limits. Thus, Plaintiff and Class members have been injured in their business or property and, therefore, have standing to sue Defendants and recover damages and the costs of bringing this class action under Section 1964(c) of RICO, 18 U.S.C. § 1962(c).

59. By virtue of their violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), Defendants, and each of them, are jointly and severally liable to Plaintiff and Class members for three times the damages that Plaintiff and Class members suffered as a result of Defendants'

scheme to defraud consumers.

## SECOND CAUSE OF ACTION
### (For Violations of Section 1962(d) of RICO)

60.     The preceding paragraphs of this Complaint are realleged and incorporated herein by reference.  This claim, which asserts violations of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), is asserted against all Defendants.

61.     Defendants willfully combined, conspired and agreed to conduct and participate, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), thereby violating Section 1962(d) of RICO, 18 U.S.C. § 1962(d).  This racketeering activity consisted of repeated violations of the federal wire fraud statute.

62.     Defendants knew of, agreed to, and acted in furtherance of the overall objective of the conspiracy by, *inter alia*, entering into marketing and sales agreements with e-commerce merchants that formed the structure, mechanism, and financial incentive for defrauding consumers of "membership fees" relating to Defendants' Membership Programs.

63.     As a direct and proximate result of the conspiracy to commit the predicate acts of wire fraud in violation of 18 U.S.C. § 1962(d) as detailed above, Plaintiff and Class members were enrolled in and charged for Membership Programs, on an ongoing basis, at the cost of $14.95 to $20.95 per month or more, plus any fees charged by financial institutions when Defendants' activities resulted in the consumer's account to be overdrawn or to exceed maximum available credit limits.  Thus, Plaintiff and Class members have been injured in their business or property and, therefore, have standing to sue Defendants and recover damages and

costs of bringing this class action under Section 1964(d) of RICO, 18 U.S.C. § 1962(d).

64.     By virtue of their violations of Section 1962(d) of RICO, 18 U.S.C. § 1962(d),

Defendants, and each of them, are jointly and severally liable to Plaintiff and Class members for

three times the damages that Plaintiff and Class members suffered as a result of Defendants'

conspiracy to defraud consumers.

### THIRD CAUSE OF ACTION
### (For Violations of Section 2510, *et seq.* of the ECPA)

65.     The preceding paragraphs of this Complaint are realleged and incorporated herein

by reference.  This claim, which asserts violations of the ECPA, 18 U.S.C. § 2510, *et seq.*, is

asserted against all Defendants.

66.     The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing]

to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral,

or electronic communication."  18 U.S.C. § 2510(1)(a).  "Electronic communication" is defined

as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature

transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical

system that affects interstate or foreign commerce."  18 U.S.C. § 2510(12).  "Intercept" is

defined as the "acquisition of the contents of any wire, electronic, or oral communication through

the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

67.     During the Class Period, Plaintiff and Class members transmitted their personal,

private, and confidential bank, debit, and/or credit card information and other related billing

information from their computers to the websites of various e-retailers, which constitute

"electronic communications" within the meaning of 18 U.S.C. § 2510(12).  Plaintiff and Class

members made these transmissions to purchase products and/or services which did not include membership in the Membership Programs of Defendants.

68.     Without notice to Plaintiff and Class members and in furtherance of their fraudulent, deceptive, and unlawful business practice of enrolling and charging unwitting consumers for Defendants' Membership Programs as alleged in this Complaint, Defendants intentionally intercepted the electronic communications of Plaintiff and Class members by means of electronic devices, including, but not limited to their computers, in violation of 18 U.S.C. § 2510(1)(a).

69.     Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual and punitive damages, reasonable attorneys' fees and other litigation costs, and Defendants' profits obtained from the above-described violations.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

70.     The preceding paragraphs of this Complaint are realleged and incorporated herein by reference.  This claim for unjust enrichment is asserted against all Defendants.

71.     As a result of Defendants' fraudulent, deceptive, and wrongful conduct, Plaintiff and members of the Class have conferred benefits upon Defendants in the form of payment for Defendants' program memberships.

72.     Defendants were at all times aware that the benefits conferred upon by them by Plaintiff and the Class were the result of Defendants' fraudulent, deceptive, and wrongful conduct.

73.     Allowing Defendants to retain these unjust profits and other benefits would offend traditional notions of justice and fair play.  Under these circumstances, it would be inequitable for Defendants to retain the benefits and allowing them to do so would induce companies to fraudulently conceal, mislead, and/or misrepresent key characteristics and obligations of their products in order to increase sales and profit.

74.     Plaintiff, on behalf of himself and all others similarly situated, seeks restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request the following relief:

(A)     An order certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Class, and designating his counsel as counsel for the Class;

(B)     An order prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, pursuant to 18 U.S.C. § 1964(a);

(C)     An order requiring Defendants to immediately cease their wrongful conduct as set forth above, as well as enjoining Defendants from continuing to falsely market and advertise, conceal material information and conduct business via the unlawful and unfair business acts and practices complained of herein; an order requiring Defendants to engage in a corrective notice campaign; and an order requiring Defendants to refund to Plaintiff and Class members the funds paid to Defendants for their enrollment in their Membership Programs;

(D)     Damages in an amount equal to treble the damages suffered by Plaintiff and Class members as proven at trial, plus costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

(E)     All damages and interest thereon to which Plaintiff and Class members are entitled, plus costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 2520;

(F)     Restitution and disgorgement of all amounts obtained by Defendants as a result of their misconduct;

(G)     Any and all equitable and declaratory relief as the Court deems just and proper;

(H)     All recoverable compensatory and other damages sustained by Plaintiff and the

Class;

(I)     Reasonable attorneys' fees and costs of suit;

(J)     Pre-judgment and post-judgment interest; and

(K)     All such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully Submitted,


  /s/ Patrick A. Klingman
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen M. Leser-Grenon (ct23587)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone:  (860) 526-1100
Facsimile:  (860) 526-1120
Email: jmiller@sfmslaw.com
           pklingman@sfmslaw.com
           kleser@sfmslaw.com

Lee Albert
Gregory Frank
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone:  (212) 682-1818
Facsimile:  (212) 682-1892
Email: lalbert@murrayfrank.com
           gfrank@murrayfrank.com

-28-

James C. Shah
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, PA  19063
Telephone:  (610) 891-9880
Facsimile:  (610) 891-9883
Email:  jshah@sfmslaw.com

Rose F. Luzon
Shepherd, Finkelman, Miller & Shah, LLP
401 West A Street, Suite 2350
San Diego, CA   92101
Telephone:  (619) 235-2416
Facsimile:  (619) 234-7334
Email:  rluzon@sfmslaw.com

***Attorneys for Plaintiff and the Proposed Class***